# EXHIBIT 16

## Settlement Agreement and Acquisition Agreement (collectively, the "2001 Consent Decree")

## SETTLEMENT AGREEMENT

**THIS SETTLEMENT AGREEMENT** is entered into by and between the Attorney General of the State of Alabama (the "Attorney General") and The Water Works and Sewer Board of the City of Birmingham, an Alabama public corporation, by and through its board of directors, Anthony L. Barnes, Jordan A. Frazier, Miles A. Creel, McDaniels A. Johnston, and Jim Lowery ("the Water Works Board") on this the 29ᵗʰ day of January, 2001.

### WITNESSETH:

**WHEREAS,** on or about July 10, 2000, the Board of Directors of the Water Works Board unanimously voted to adopt Resolution Number 3995, which authorized the Water Works Board's Chairman and General Manager to make an offer to re-acquire (i) the City of Birmingham's (the "City") water system consisting of certain water reservoirs and filtration plants, water transmission and distribution systems, and various related properties and (ii) the City's sewer system consisting of sewage treatment plants, wastewater collection systems, and various related properties (together collectively referred to as the "Systems"); and

**WHEREAS,** on or about July 18, 2000, the Council of the City of Birmingham (the "Council") accepted the Water Works Board's offer by voting to adopt Ordinance No. 00-123, which re-conveyed the Systems to the Water Works Board; and

**WHEREAS,** subsequently, on or about August 3, 2000, the Mayor of the City vetoed the Ordinance. However, on or about August 8, 2000, the Council overrode the Mayor's veto, and Ordinance No. 00-123 was published on August 11, 2000, and became effective upon such publication; and

**WHEREAS,** on or about August 10, 2000, the Mayor filed this action against the Council and the Water Works Board seeking to stop the Water Works Board from re-acquiring the Systems. Said action is presently pending before the Circuit Court of Jefferson County and is styled *Bernard Kincaid, et. al v. The Council of the City of Birmingham, et. al,* bearing Civil Action Number CV-0004779 (the "Kincaid Lawsuit"); and

**WHEREAS,** on or about September 8, 2000, the Attorney General intervened in said action on behalf of the using and consuming public to protect their interests, and asserted a counterclaim against the Mayor and a cross claim against the Council; and

**WHEREAS,** the Attorney General raised concerns as to the effect that the transaction contemplated by Ordinance No. 00-123 would have on the using and consuming public, in that the Water Works Board has a monopoly in the provisioning of water within its service area and has been exempt from direct regulation of rates by the Alabama Public Service Commission (the "APSC"); and

**WHEREAS,** the Water Works Board and the Attorney General have reached an agreement to settle the claims asserted by the Attorney General subject to the terms and conditions set out below;

**NOW, THEREFORE,** in consideration of the mutual covenants set forth below, the Water Works Board, and the Attorney General hereby agree as follows:

1.    **Public Service Commission Jurisdiction.** The parties agree that regulation of the Water Works Board by the APSC is in the public interest because it will ensure, among other things, that ratepayer revenues are used solely for purposes related to the provisioning of water. The service territory of the Water Works Board has always exceeded the boundaries of its authorizing municipality and the Water Works Board currently provides water to approximately

2

one-quarter of the population of the State of Alabama. Pursuant to Ordinance No. 00-123, the City has agreed to return the assets of the Systems to the Water Works Board that will allow for regulation of the Water Works Board pursuant to the terms of this Agreement, applicable law, and the rules and regulations of the APSC, as amended from time to time. Upon the closing of the transaction as contemplated in Ordinance No. 00-123, the Water Works Board hereby agrees to adopt a Resolution, in the form attached hereto as Exhibit "A", waiving its exemption from the jurisdiction of and regulation by the APSC set out in *Ala. Code* § 11-50-241(b)(1992) and §11-50-174(b)(1992), if applicable.   The Water Works Board, by adopting the attached Resolution, hereby voluntarily agrees to submit to comprehensive regulation by the APSC, including rate, service, equipment and transfer of asset regulations, in the same manner and to the same extent that the APSC presently regulates private entities provisioning water under Title 37 of the Alabama Code. The Water Works Board further agrees to file an application to obtain a certificate of convenience and necessity under *Ala. Code* § 37-4-28 (1992) to serve its existing territory with its existing facilities within 15 days of the closing of the transaction authorized in Ordinance No. 00-123.       As a part of the application process, the Water Works Board will comply with any other licensing or certification rules required by the APSC. The Water Works Board agrees to keep the certificate of convenience and necessity current and comply with any rules, regulations and orders of the PSC for the term of this Agreement.

2.    **Independence of the Water Works Board**.   A public corporation, such as the Water Works Board, is an entity separate and independent from the city it serves.  The Board of Directors legally may direct the business and affairs of the Water Works Board without direction or supervision by City officials.  In the event of a conflict on any issue between the APSC and

the City during the term of this Agreement, the decision of the APSC will prevail and take precedence over a decision by the City.

3.   **Schedule of Payments**.   (a)   The Acquisition Agreement that will be entered into by the Water Works Board and the City pursuant to Ordinance No. 00-123 requires that the Water Works Board assume or become responsible for the payment of certain indebtedness secured by the assets and revenues of the Systems owed by the City. The Water Works Board, in the Acquisition Agreement, will also pay the City One Hundred Ninety Six Million Dollars ($196,000,000.00) as additional consideration for the City to return the assets of the Systems to the Water Works Board.

(b)   The Water Works Board has provided a comprehensive, specific and dated schedule of payments that will be made pursuant to the transfer authorized by Ordinance No. 00-123, attached hereto as Exhibit "B". The parties agree that, except for a reasonable franchise fee, the Water Works Board will not make any future payments, other that those listed in Exhibit "B," to the City during the term of this Agreement.

4.   **Dismissal of Claims.**   Upon the execution of this Agreement, the Attorney General hereby agrees to dismiss, without prejudice, the counterclaim and cross claim asserted against the Mayor and the Council in the Kincaid Lawsuit. The Attorney General agrees not to reassert the claims presented in the Kincaid Lawsuit, if the Water Works Board fully and completely complies with each and every provision in this Agreement in a timely manner and the Attorney General, in his sole judgment, is satisfied that the business of the Water Works is being conducted independently in a manner that benefits and protects the interests of the ratepayers throughout the term of this Agreement.   The parties agree that timely payments to the bondholders benefit ratepayers.

4

5.    **Re-conveyance of System Assets.**    The Attorney General hereby acknowledges that the re-conveyance of the Systems' assets to the Water Works Board as set out in this Agreement, Resolution No. 3995 and Ordinance 00-123 is in the public interest because (a) the assets of the Systems will be owned by an independent public corporation that will be regulated and supervised by the APSC for the next 50 years;    (b) the Systems' revenues will be used solely for purposes related to the provisioning of water rather than funding general municipal needs; and, (c) development of certain real property that will be acquired by the Water Works Board in the Transaction will be restricted by a conservation easement to protect the environment associated with the watershed.

6.    **Third Party Beneficiaries.**    The ratepayers of the Water Works Board are intended to be third party beneficiaries of this Agreement and shall have full power and authority to enforce the provisions of the Agreement.  Any ratepayer desiring to enforce any provisions of this Agreement must first exhaust all administrative remedies prior to instituting legal action under this provision.

7.    **Conservation Easement.**  In order to ensure that the assets of the Systems are properly utilized to operate the Systems and to ensure that the assets of the Systems are permanently protected from any and all land development activities which could be harmful to the Systems, the Water Works Board hereby agrees to place a conservation easement on the System's real estate described in paragraph 7 of the Acquisition Agreement that will be entered into by the Water Works Board and the City, pursuant to Ordinance No. 00-123, under which the Water Works Board shall be the holder of said easement. The parties will agree on the final form of the easement and the terms and conditions of the easement must be satisfactory to the Attorney General.  The State of Alabama through the Office of the Attorney General, shall have

5

a third party right of enforcement of said conservation easement for the benefit of the Systems' ratepayers. The Water Works Board agrees to record the easement in the offices of the Judges of Probate of Jefferson and Shelby Counties within 30 days of the closing of the transaction approved in Ordinance No. 00-123. The Water Works Board hereby agrees that the Attorney General shall be a "key stakeholder" in the land use study described in paragraph 7 of the Acquisition Agreement.

8.      **Term.**  This Agreement shall be in full force and effect for a term of 50 years and shall terminate without notice on February 1, 2051.

9.      **Representation of Ratepayers**.  The Attorney General specifically reserves the right to take whatever action he deems necessary or advisable to protect the interests of the ratepayers during the term of this Agreement, including, but not limited to, matters involving rate, service, facilities or equipment issues.  This reservation specifically includes any matters involved in implementing this Agreement.  The Attorney General agrees to exhaust any applicable administrative remedies available at the APSC, if any exist, prior to initiating any legal action in the courts under this provision.

10.     **Joint Drafting.**  This Agreement is fully understood by the undersigned parties, and the parties agree that, in construing this document, it is to be construed as having been jointly drafted by the parties hereto.

11.     **Entire Agreement.**  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes all other prior agreements and understandings, both written and oral, between said parties.

12.     **Governing Law.**  This Agreement shall be governed by, construed, and enforced in accordance with the laws of the State of Alabama.

6

13.    **No Admission.**    It is understood that this Agreement is entered into to compromise disputed claims, and that nothing contained herein is to be construed as an admission by any party hereto.

14.    **Successors and Assigns.**  This Agreement shall be binding upon, and inure to the benefit of the parties hereto, including their respective successors and assigns.

15.    **Amendment.**  This Agreement may only be amended by a written agreement executed by all of the parties hereto.

16.    **Severability.**  In the event that any condition or provision of this Agreement shall be held to be invalid or against public policy by a court of competent jurisdiction, the remaining provisions shall continue in full force and effect, and all of the parties agree to use their best efforts and resources to cure any provision held invalid or against public policy.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date set out above.

Bill Pryor
Attorney General
State of Alabama


ATTEST:

Its Secretary–Treasurer or
Assistant Secretary-Treasurer


34111-1/26/01-2:15p.m.\hh


**THE WATER WORKS AND SEWER BOARD
OF THE CITY OF BIRMINGHAM**

By
Anthony L. Barnes
Its Chairman-President

7

Exhibit "A"

Exhibit "A"

## RESOLUTION No. _____

**WHEREAS,** The Water Works and Sewer Board of the City of Birmingham (the "Water Works Board") is an Alabama public corporation created under Alabama Code Section 11-50-230, et seq. (1975); and

**WHEREAS,** on or about July 10, 2000, the Water Works Board unanimously voted to adopt Resolution Number 3995, which authorized the Water Works Board's Chairman and General Manager to make an offer to re-acquire (i) the City of Birmingham's (the "City") water system consisting of certain water reservoirs and filtration plants, water transmission and distribution systems, and various related properties and (ii) the City's sewer system consisting of sewage treatment plants, wastewater collection systems, and various related properties (together collectively referred to as the "Systems"); and

**WHEREAS,** on or about July 18, 2000, the Council accepted the Water Works Board's offer by voting to adopt Ordinance No. 00-123, which re-conveyed the Systems to the Water Works Board (the transaction authorized by Resolution No. 3995 and Ordinance No. 00-123 shall hereinafter be referred to as the "Transaction") ; and

**WHEREAS,** subsequently, on or about August 3, 2000, the Mayor of the City vetoed the Ordinance. However, on or about August 8, 2000, the Council overrode the Mayor's veto, and Ordinance No. 00-123 was published on August 11, 2000, and became effective upon such publication; and

**WHEREAS,** on or about August 10, 2000, the Mayor filed an action against the Council and the Water Works Board seeking to stop the Water Works Board from re-acquiring the Systems. Said action is presently pending before the Circuit Court of Jefferson County and is styled *Bernard Kincaid, et. al v. The Council of the City of Birmingham, et. al,* bearing Civil Action Number CV-0004779 (the "*Kincaid* Lawsuit"); and

**WHEREAS,** on or about September 8, 2000, the Attorney General intervened in said action on behalf of the using and consuming public to protect their interests, and asserted a counterclaim against the Mayor and a cross claim against the Council; and

**WHEREAS,** the Attorney General raised concerns as to the effect that the transaction contemplated by Ordinance No. 00-123 would have on the using and consuming public, in that the Water Works Board has a monopoly in the provisioning of water within its service area and has been exempt from direct regulation of rates by the Alabama Public Service Commission; and

**WHEREAS,** the Attorney General has determined that if the Water Works Board would agree to waive the exemption from jurisdiction and regulation by the Alabama Public Service

Commission afforded the Water Works Board by Alabama Code Section 11-50-241(b) (1975), the Transaction would be in the public interest; and,

**WHEREAS,** the Water Works Board and the Attorney General reached an agreement to settle the claims asserted by the Attorney General; and

**WHEREAS,** part of the settlement agreement between the Water Works Board and the Attorney General involved the Water Works Board agreeing, once the Transaction was closed, to waive the exemption from jurisdiction and regulation by the Alabama Public Service Commission afforded the Board by Alabama Code Section 11-50-241(b) (1975); and

**WHEREAS,** the Water Works Board is the largest water purveyor in the State of Alabama, providing potable water to nearly a quarter of the State's population; and

**WHEREAS,** the Water Works Board has always provided its customers with the highest quality of water and service at below national average rates and believes that it will continue to be able to do so in the future when it becomes subject to the jurisdiction and regulation of the Alabama Public Service Commission.

**NOW THEREFORE,** on a motion made by _____ and seconded by _____, The Water Works and Sewer Board of the City of Birmingham hereby resolves as follows:

1.    The Board hereby finds and declares that it would be in the best interests of its customers and employees for the Transaction as defined above to be closed.

2.    As consideration of the settlement of the Attorney General's claims asserted in the *Kincaid* lawsuit, the Water Works Board agrees and hereby voluntarily and freely waives the exemption from jurisdiction and regulation by the Alabama Public Service Commission afforded the Water Works Board by Alabama Code Section 11-50-241(b) (1975) and any other applicable law, and hereby voluntarily submits to comprehensive regulation by the Alabama Public Service Commission including rate, service, equipment and transfer of asset regulations, in the same manner and to the same extent that the Alabama Public Service Commission presently regulates private entities provisioning water under Title 37 of the Alabama Code. As a part of the application process, the Water Works Board will comply with any other licensing or certification rules required by the Alabama Public Service Commission. The Water Works Board agrees to keep the certificate of convenience and necessity current and comply with any rules, regulations, and orders of the Alabama Public Service Commission for the term of the Agreement.

3.    The General Manager is hereby authorized and directed to file an application with the Alabama Public Service Commission to obtain a certificate of convenience and necessity pursuant to Ala. Code Section 37-4-28 (1975), together with all necessary documents within 15 days from the date of the closing of the Transaction.

ADOPTED this the _____ day of _____, 2001.

Exhibit "B"

## EXHIBIT "B"

### SCHEDULE OF PAYMENTS

The following Schedule of Payments summarizes the obligations the Water Works Board will be assuming or becoming responsible for the payment of under the Acquisition Agreement (less any principal and interest payments made by the City of Birmingham that have come due and payable prior to the closing of the transaction authorized under said Acquisition Agreement):

1)    Series 1992 Bonds in the principal amount of $35,000.00. Said bond to mature in 2006. The total to be paid by the Water Works Board in interest and principal is $46,841.00. See Exhibit "1" attached hereto.

2)    Series 1998-A Bonds in the principal amount of $140,750.00. Said bonds to mature according to the schedule attached hereto as Exhibit "1". The total to be paid by the Water Works Board in interest and principal is $284,473,647.

3)    Series 1998-B Bonds in the outstanding aggregate principal amount of $36,635,000.00. Said bonds to mature according to the schedule attached hereto as Exhibit "1". The total to be paid by the Water Works Board in interest and principal is $48,958,704.

4)    Series 1998-A Warrants in the principal amount of $10,000,000.00. Said warrants have a mandatory redemption schedule as set forth on Exhibit "2". Said series warrants are variable rate obligations, therefore, the total to be paid by the Water Works Board in interest and principal cannot be determined.

5)    Series 1998-B Warrants in the principal amount of $31,000,000.00. Said warrants to mature according to the schedule attached hereto as Exhibit "3". The total to be paid by the Water Works Board in interest and principal is $58,400,219.79.

6)    Series 2000-A Warrants in the principal amount of 57,000,000.00. . Said warrants to mature according to the schedule attached hereto as Exhibit "4". The total to be paid by the Water Works Board in interest and principal is $104,872,007.50.

7)    Pursuant to the Acquisition Agreement, the payment of $196,000,000.00.

**EXHIBIT 1**

# THE WATER WORKS AND SEWER FUND
## OF THE CITY OF BIRMINGHAM, ALABAMA
### SCHEDULE OF LONG-TERM DEBT SERVICE REQUIREMENTS
#### June 30, 2000

| Maturity Date | Series 1992 Bonds | | | | Series 1998-A Bonds | | | |
|---|---|---|---|---|---|---|---|---|
| | Rate | Principal | Interest | Total | Rate | Principal | Interest | Total |
| 2001 | | | $ 2,153 | $ 2,153 | | | $ 6,853,131 | $ 6,853,131 |
| 2002 | | | 2,153 | 2,153 | | | 6,853,131 | 6,853,131 |
| 2003 | | | 2,153 | 2,153 | | | 6,853,131 | 6,853,131 |
| 2004 | | | 2,153 | 2,153 | | | 6,853,131 | 6,853,131 |
| 2005 | | | 2,153 | 2,153 | | | 6,853,131 | 6,853,131 |
| 2006 | 6.150 | $35,000 | 1,076 | 36,076 | | | 6,853,131 | 6,853,131 |
| 2007 | | | | | | | 6,853,131 | 6,853,131 |
| 2008 | | | | | | | 6,853,131 | 6,853,131 |
| 2009 | | | | | | | 6,853,131 | 6,853,131 |
| 2010 | | | | | | | 6,853,131 | 6,853,131 |
| 2011 | | | | | 5.125 | $ 2,165,000 | 6,797,653 | 8,962,653 |
| 2012 | | | | | 5.125 | 4,880,000 | 6,617,125 | 11,497,125 |
| 2013 | | | | | 5.125 | 5,140,000 | 6,360,363 | 11,500,363 |
| 2014 | | | | | 5.125 | 5,410,000 | 6,090,019 | 11,500,019 |
| 2015 | | | | | 5.125 | 5,695,000 | 5,805,453 | 11,500,453 |
| 2016 | | | | | 5.125 | 5,995,000 | 5,505,897 | 11,500,897 |
| 2017 | | | | | 5.125 | 6,310,000 | 5,190,581 | 11,500,581 |
| 2018 | | | | | 5.000 | 6,635,000 | 4,863,013 | 11,498,013 |
| 2019 | | | | | 5.000 | 6,975,000 | 4,522,763 | 11,497,763 |
| 2020 | | | | | 4.750 | 7,325,000 | 4,174,419 | 11,499,419 |
| 2021 | | | | | 4.750 | 7,680,000 | 3,818,050 | 11,498,050 |
| 2022 | | | | | 4.750 | 8,055,000 | 3,444,344 | 11,499,344 |
| 2023 | | | | | 4.750 | 8,445,000 | 3,052,469 | 11,497,469 |
| 2024 | | | | | 4.750 | 8,855,000 | 2,641,594 | 11,496,594 |
| 2025 | | | | | 4.750 | 9,290,000 | 2,210,650 | 11,500,650 |
| 2026 | | | | | 4.750 | 9,740,000 | 1,758,688 | 11,498,688 |
| 2027 | | | | | 4.750 | 10,215,000 | 1,284,756 | 11,499,756 |
| 2028 | | | | | 4.750 | 10,710,000 | 787,788 | 11,497,788 |
| 2029 | | | | | 4.750 | 11,230,000 | 266,712 | 11,496,712 |
| | | $35,000 | $11,841 | $46,841 | | $140,750,000 | $143,723,647 | $284,473,647 |

| | Series 1998-B Bonds | | | | Aggregate Debt Service | | |
|---|---|---|---|---|---|---|---|
| Rate | Principal | Interest | Total | Rate | Principal | Interest | Total |
| 5.200 | $2,630,000 | $2,013,493 | $4,643,493 | | $  2,630,000 | $  8,868,777 | 11,498,777 |
| 5.370 | 2,770,000 | 1,870,738 | 4,640,738 | | 2,770,000 | 8,726,022 | 11,496,022 |
| 5.450 | 2,925,000 | 1,716,657 | 4,641,657 | | 2,925,000 | 8,571,941 | 11,496,941 |
| 5.490 | 3,090,000 | 1,552,131 | 4,642,131 | | 3,090,000 | 8,407,415 | 11,497,415 |
| 5.680 | 3,270,000 | 1,374,442 | 4,644,442 | | 3,270,000 | 8,229,726 | 11,499,726 |
| 5.700 | 3,460,000 | 1,182,964 | 4,642,964 | | 3,495,000 | 8,037,171 | 11,532,171 |
| 5.790 | 3,665,000 | 978,252 | 4,643,252 | | 3,665,000 | 7,831,383 | 11,496,383 |
| 5.800 | 3,885,000 | 759,485 | 4,644,485 | | 3,885,000 | 7,612,616 | 11,497,616 |
| 5.870 | 4,115,000 | 526,045 | 4,641,045 | | 4,115,000 | 7,379,176 | 11,494,176 |
| 5.920 | 4,365,000 | 276,066 | 4,641,066 | | 4,365,000 | 7,129,197 | 11,494,197 |
| 5.970 | 2,460,000 | 73,431 | 2,533,431 | | 4,625,000 | 6,871,084 | 11,496,084 |
| | | | | | 4,880,000 | 6,617,125 | 11,497,125 |
| | | | | | 5,140,000 | 6,360,363 | 11,500,363 |
| | | | | | 5,410,000 | 6,090,019 | 11,500,019 |
| | | | | | 5,695,000 | 5,805,453 | 11,500,453 |
| | | | | | 5,995,000 | 5,505,897 | 11,500,897 |
| | | | | | 6,310,000 | 5,190,581 | 11,500,581 |
| | | | | | 6,635,000 | 4,863,013 | 11,498,013 |
| | | | | | 6,975,000 | 4,522,763 | 11,497,763 |
| | | | | | 7,325,000 | 4,174,419 | 11,499,419 |
| | | | | | 7,680,000 | 3,818,050 | 11,498,050 |
| | | | | | 8,055,000 | 3,444,344 | 11,499,344 |
| | | | | | 8,445,000 | 3,052,469 | 11,497,469 |
| | | | | | 8,855,000 | 2,641,594 | 11,496,594 |
| | | | | | 9,290,000 | 2,210,650 | 11,500,650 |
| | | | | | 9,740,000 | 1,758,688 | 11,498,688 |
| | | | | | 10,215,000 | 1,284,756 | 11,499,756 |
| | | | | | 10,710,000 | 787,788 | 11,497,788 |
| | | | | | 11,230,000 | 266,712 | 11,496,712 |
| | $36,635,000 | $12,323,704 | $48,958,704 | | $177,420,000 | $156,059,192 | $333,479,192 |

Less: Unamortized bond issuance cost          1,606,820

Less: Bond discount                          3,037,782

Less: Accounting loss on long-term debt refunding     10,395,519

$162,379,879

22

**EXHIBIT 2**

NEW ISSUE

Ratings:
Standard & Poor's: AA/A-1
Fitch: AA/NR
Moody's: Aa1/VMIG 1

*In the opinion of Bond Counsel, under existing law interest on the Series 1998-A Warrants (i) will be excluded from gross income for federal income tax purposes if the City complies with all requirements of the Internal Revenue Code that must be satisfied subsequent to the issuance of the Series 1998-A Warrants in order that interest thereon be and remain excluded from gross income, and (ii) will not be an item of tax preference for purposes of the federal alternative minimum tax on individuals and corporations. Bond Counsel is also of the opinion that under existing law interest on the Series 1998-A Warrants will be exempt from present State of Alabama income taxation. See "TAX EXEMPTION" herein for further information and certain other federal tax consequences arising with respect to the Series 1998-A Warrants.*

# CITY OF BIRMINGHAM, ALABAMA
## $10,000,000
## General Obligation Capital Improvement Warrants, Series 1998-A

Dated: As of date of initial delivery

Due: June 1, 2011

The Series 1998-A Warrants constitute general obligations of the City for the payment of which its full faith and credit are irrevocably pledged. Certain payments on the Series 1998-A Warrants are to be made under an irrevocable, direct-pay letter of credit issued by

# REGIONS BANK,

an Alabama banking corporation.

The Series 1998-A Warrants shall never constitute a personal liability or charge against the general credit or taxing powers of the State of Alabama, or any other political subdivision of the State of Alabama, except for the City of Birmingham.

The letter of credit will provide for payment of debt service on the Series 1998-A Warrants and the Purchase Price of Series 1998-A Warrants tendered for purchase in accordance with the terms of the Trust Indenture pursuant to which the Series 1998-A Warrants are issued. The letter of credit may be terminated at the option of the Bank at any time after June 15, 2003 upon 2 years' prior notice. The Indenture provides that prior to the termination of the letter of credit the Series 1998-A Warrants must be purchased pursuant to the mandatory tender provisions of the Indenture. The Indenture provides that a substitute letter of credit may be delivered to the Trustee under certain conditions, as described herein.

The Series 1998-A Warrants are subject to redemption, mandatory tender and purchase, and optional tender and purchase, all as described herein.

The Series 1998-A Warrants will bear interest from their date of issuance at the Weekly Rate, until converted to the Commercial Paper Rate or the Term Rate, as set forth herein. The Weekly Rate will be determined by Regions Investment Company, Inc., as Remarketing Agent. At the time of conversion to another interest rate, the Series 1998-A Warrants are subject to mandatory tender for purchase, as discussed herein.

Price of all Series 1998-A Warrants
100%

*The Series 1998-A Warrants are offered, when, as and if issued, subject to approval of validity by Haskell Slaughter & Young L.L.C., Birmingham, Alabama, Bond Counsel. Certain legal matters will be passed upon for the Underwriter by its counsel, Walston, Wells, Anderson & Bains, LLP, Birmingham, Alabama. It is expected that the Series 1998-A Warrants in definitive form will be available for delivery in New York, New York or Birmingham, Alabama, at the option of the purchaser on or about August 7, 1998.*

# **Regions** Investment Company, Inc.

The date of this Official Statement is July 28, 1998.

(2)    Scheduled Mandatory Redemption.  Unless Serial Maturities have been assigned to the Series 1998-A Warrants, the Series 1998-A Warrants shall be redeemed, at a redemption price equal to 100% of the principal amount to be redeemed plus accrued interest thereon to the redemption date, on June 1 in years and principal amounts (after credit as provided below) as follows:

| Year | Principal Amount of Series 1998-A Warrants to be Redeemed |
|------|------------------------------------------|
| 2001 | $   235,000 |
| 2002 | 500,000 |
| 2003 | 860,000 |
| 2004 | 915,000 |
| 2005 | 950,000 |
| 2006 | 1,005,000 |
| 2007 | 940,000 |
| 2008 | 1,100,000 |
| 2009 | 1,130,000 |
| 2010 | 1,145,000 |

The balance of the principal amount of the Series 1998-A Warrants ($1,220,000) is scheduled to be paid at maturity on June 1, 2011.

Not less than 45 or more than 60 days prior to each such scheduled mandatory redemption date, the Paying Agent shall proceed to select for redemption, by lot, Series 1998-A Warrants or portions thereof in an aggregate principal amount equal to the amount required to be redeemed and shall call such Series 1998-A Warrants or portions thereof for redemption on such scheduled mandatory redemption date; provided, however, that such selection shall be made only from Series 1998-A Warrants subject to optional redemption pursuant to paragraph (A), (B) or (C) above on such scheduled mandatory redemption date; and provided further that the City may, upon direction delivered to the Paying Agent not less than 60 days prior to such scheduled mandatory redemption date, direct that any or all of the following amounts be credited against the principal amount of Series 1998-A Warrants scheduled for redemption on such date:  (i) the principal amount of Series 1998-A Warrants delivered by the City to the Paying Agent for cancellation and not previously claimed as a credit; and (ii) the principal amount of Series 1998-A Warrants previously redeemed (other than Series 1998-A Warrants redeemed pursuant to this paragraph) and not previously claimed as a credit.

### Partial Redemption

Subject to the provisions of the Indenture requiring redemption of all Pledged Warrants eligible for redemption before any other eligible Series 1998-A Warrants are redeemed, and except as otherwise provided with respect to scheduled mandatory redemption of Series 1998-A

14

**EXHIBIT 3**

TOTAL DEBT SERVICE REQUIREMENTS OF THE 1998B TAX-EXEMPT WARRANTS    SCHEDU

CITY OF BIRMINGHAM, ALABAMA

DATED DATE  12  1  1998    SETTLEMENT DATE  12  30  1998
ACCRUED INTEREST    114,049.53

| DATE | PRINCIPAL | INTEREST RATE | INTEREST | TOTAL REQUIREMENTS |
|------|-----------|---------------|----------|--------------------|
| JUL 1 99 | | | 325,876.04 | 325,876.04 |
| JAN 1 0 | 525,000.00 | 3.4500 | 707,893.75 | 1,232,893.75 |
| JUL 1 0 | | | 698,837.50 | 698,837.50 |
| JAN 1 1 | 545,000.00 | 3.7000 | 698,837.50 | 1,243,837.50 |
| JUL 1 1 | | | 688,755.00 | 688,755.00 |
| JAN 1 2 | 565,000.00 | 3.5000 | 688,755.00 | 1,253,755.00 |
| JUL 1 2 | | | 678,020.00 | 678,020.00 |
| JAN 1 3 | 585,000.00 | 3.9000 | 678,020.00 | 1,263,020.00 |
| JUL 1 3 | | | 666,612.50 | 666,612.50 |
| JAN 1 4 | 610,000.00 | 3.9500 | 666,612.50 | 1,276,612.50 |
| JUL 1 4 | | | 654,565.00 | 654,565.00 |
| JAN 1 5 | 635,000.00 | 4.0000 | 654,565.00 | 1,289,565.00 |
| JUL 1 5 | | | 641,865.00 | 641,865.00 |
| JAN 1 6 | 660,000.00 | 4.0500 | 641,865.00 | 1,301,865.00 |
| JUL 1 6 | | | 628,500.00 | 628,500.00 |
| JAN 1 7 | 685,000.00 | 4.1000 | 628,500.00 | 1,313,500.00 |
| JUL 1 7 | | | 614,457.50 | 614,457.50 |
| JAN 1 8 | 715,000.00 | 4.1500 | 614,457.50 | 1,329,457.50 |
| JUL 1 8 | | | 599,621.25 | 599,621.25 |
| JAN 1 9 | 745,000.00 | 4.2000 | 599,621.25 | 1,344,621.25 |
| JUL 1 9 | | | 583,976.25 | 583,976.25 |
| JAN 1 10 | 775,000.00 | 4.3000 | 583,976.25 | 1,358,976.25 |
| JUL 1 10 | | | 567,313.75 | 567,313.75 |
| JAN 1 11 | 810,000.00 | 4.4000 | 567,313.75 | 1,377,313.75 |
| JUL 1 11 | | | 549,493.75 | 549,493.75 |
| JAN 1 12 | 845,000.00 | 4.5000 | 549,493.75 | 1,394,493.75 |
| JUL 1 12 | | | 530,481.25 | 530,481.25 |
| JAN 1 13 | 880,000.00 | 4.6000 | 530,481.25 | 1,410,481.25 |
| JUL 1 13 | | | 510,241.25 | 510,241.25 |
| JAN 1 14 | 925,000.00 | 4.7000 | 510,241.25 | 1,435,241.25 |
| JUL 1 14 | | | 488,503.75 | 488,503.75 |
| JAN 1 15 | 965,000.00 | 4.7500 | 488,503.75 | 1,453,503.75 |
| JUL 1 15 | | | 465,585.00 | 465,585.00 |
| JAN 1 16 | 1,010,000.00 | 4.8000 | 465,585.00 | 1,475,585.00 |
| JUL 1 16 | | | 441,345.00 | 441,345.00 |
| JAN 1 17 | 1,060,000.00 | 4.8750 | 441,345.00 | 1,501,345.00 |
| JUL 1 17 | | | 415,507.50 | 415,507.50 |
| JAN 1 18 | 1,110,000.00 | 4.9000 | 415,507.50 | 1,525,507.50 |
| JUL 1 18 | | | 388,312.50 | 388,312.50 |
| JAN 1 19 | 1,165,000.00 | 4.7500 | 388,312.50 | 1,553,312.50 |

Case 2:35-cv-00356-ECM-KFP   Document 24-17   Filed 05/14/25   Page 22 of 54

TOTAL DEBT SERVICE REQUIREMENTS OF ... 1998    SCHEDULE

CITY OF BIRMINGHAM, ALABAMA

DATED DATE  12  1  1998   SETTLEMENT DATE  12  30  1998
ACCRUED INTEREST       114,069.55

| DATE | PRINCIPAL | INTEREST RATE | INTEREST | TOTAL REQUIREMENTS |
|------|-----------|---------------|----------|--------------------|
| JUL 1 19 | | | 360,643.75 | 360,643.75 |
| JAN 1 20 | 1,220,000.00 | 4.7500 | 360,643.75 | 1,580,643.75 |
| JUL 1 20 | | | 331,668.75 | 331,668.75 |
| JAN 1 21 | 1,280,000.00 | 4.7500 | 331,668.75 | 1,611,668.75 |
| JUL 1 21 | | | 301,268.75 | 301,268.75 |
| JAN 1 22 | 1,340,000.00 | 4.7500 | 301,268.75 | 1,641,268.75 |
| JUL 1 22 | | | 269,443.75 | 269,443.75 |
| JAN 1 23 | 1,405,000.00 | 4.7500 | 269,443.75 | 1,674,443.75 |
| JUL 1 23 | | | 236,075.00 | 236,075.00 |
| JAN 1 24 | 1,470,000.00 | 4.7500 | 236,075.00 | 1,706,075.00 |
| JUL 1 24 | | | 201,162.50 | 201,162.50 |
| JAN 1 25 | 1,540,000.00 | 4.7500 | 201,162.50 | 1,741,162.50 |
| JUL 1 25 | | | 164,587.50 | 164,587.50 |
| JAN 1 26 | 1,615,000.00 | 4.7500 | 164,587.50 | 1,779,587.50 |
| JUL 1 26 | | | 126,231.25 | 126,231.25 |
| JAN 1 27 | 1,690,000.00 | 4.7500 | 126,231.25 | 1,816,231.25 |
| JUL 1 27 | | | 86,093.75 | 86,093.75 |
| JAN 1 28 | 1,770,000.00 | 4.7500 | 86,093.75 | 1,856,093.75 |
| JUL 1 28 | | | 44,056.25 | 44,056.25 |
| JAN 1 29 | 1,855,000.00 | 4.7500 | 44,056.25 | 1,899,056.25 |
| | 31,000,000.00 | | 27,400,219.79 | 58,400,219.79 |

**City of Biloxi — General Obligation Capital Improvement Warrants, Series 2000-A, Dated 9-1-2000 ($57,000,000.00)**

| MATURITY DATE | PRINCIPAL OUTSTANDING | PRINCIPAL MATURING | INTEREST MATURING | TOTAL MATURING |
|---|---|---|---|---|
| 01-Feb-01 | $57,000,000.00 | 0.00 | $1,247,725.00 | $1,247,725.00 |
| 01-Aug-01 | 55,905,000.00 | 1,095,000.00 | 1,497,270.00 | 2,592,270.00 |
| 01-Feb-02 | 55,905,000.00 | 0.00 | 1,473,727.50 | 1,473,727.50 |
| 01-Aug-02 | 54,645,000.00 | 1,260,000.00 | 1,473,727.50 | 2,733,727.50 |
| 01-Feb-03 | 54,645,000.00 | 0.00 | 1,448,837.50 | 1,448,837.50 |
| 01-Aug-03 | 53,330,000.00 | 1,315,000.00 | 1,448,837.50 | 2,761,837.50 |
| 01-Feb-04 | 53,330,000.00 | 0.00 | 1,418,038.25 | 1,418,038.25 |
| 01-Aug-04 | 51,955,000.00 | 1,375,000.00 | 1,418,038.25 | 2,793,038.25 |
| 01-Feb-05 | 51,955,000.00 | 0.00 | 1,387,788.25 | 1,387,788.25 |
| 01-Aug-05 | 50,520,000.00 | 1,435,000.00 | 1,387,788.25 | 2,822,788.25 |
| 01-Feb-06 | 50,520,000.00 | 0.00 | 1,350,117.50 | 1,350,117.50 |
| 01-Aug-06 | 49,010,000.00 | 1,510,000.00 | 1,350,117.50 | 2,860,117.50 |
| 01-Feb-07 | 49,010,000.00 | 0.00 | 1,310,480.00 | 1,310,480.00 |
| 01-Aug-07 | 47,420,000.00 | 1,590,000.00 | 1,310,480.00 | 2,900,480.00 |
| 01-Feb-08 | 47,420,000.00 | 0.00 | 1,274,307.50 | 1,274,307.50 |
| 01-Aug-08 | 45,760,000.00 | 1,660,000.00 | 1,274,307.50 | 2,934,307.50 |
| 01-Feb-09 | 45,760,000.00 | 0.00 | 1,236,127.50 | 1,236,127.50 |
| 01-Aug-09 | 44,025,000.00 | 1,735,000.00 | 1,236,127.50 | 2,971,127.50 |
| 01-Feb-10 | 44,025,000.00 | 0.00 | 1,195,788.75 | 1,195,788.75 |
| 01-Aug-10 | 42,205,000.00 | 1,820,000.00 | 1,195,788.75 | 3,015,788.75 |
| 01-Feb-11 | 42,205,000.00 | 0.00 | 1,153,018.75 | 1,153,018.75 |
| 01-Aug-11 | 40,300,000.00 | 1,905,000.00 | 1,153,018.75 | 3,058,018.75 |
| 01-Feb-12 | 40,300,000.00 | 0.00 | 1,107,298.75 | 1,107,298.75 |
| 01-Aug-12 | 38,305,000.00 | 1,995,000.00 | 1,107,298.75 | 3,102,298.75 |
| 01-Feb-13 | 38,305,000.00 | 0.00 | 1,057,423.75 | 1,057,423.75 |
| 01-Aug-13 | 36,210,000.00 | 2,095,000.00 | 1,057,423.75 | 3,152,423.75 |
| 01-Feb-14 | 36,210,000.00 | 0.00 | 1,005,048.75 | 1,005,048.75 |
| 01-Aug-14 | 34,010,000.00 | 2,200,000.00 | 1,005,048.75 | 3,205,048.75 |
| 01-Feb-15 | 34,010,000.00 | 0.00 | 944,548.75 | 944,548.75 |
| 01-Aug-15 | 31,690,000.00 | 2,320,000.00 | 944,548.75 | 3,264,548.75 |
| 01-Feb-16 | 31,690,000.00 | 0.00 | 880,748.75 | 880,748.75 |
| 01-Aug-16 | 29,240,000.00 | 2,450,000.00 * | 880,748.75 | 3,330,748.75 |
| 01-Feb-17 | 29,240,000.00 | 0.00 | 810,311.25 | 810,311.25 |
| 01-Aug-17 | 26,650,000.00 | 2,590,000.00 | 810,311.25 | 3,400,311.25 |
| 01-Feb-18 | 26,650,000.00 | 0.00 | 735,848.75 | 735,848.75 |
| 01-Aug-18 | 23,915,000.00 | 2,735,000.00 ** | 735,848.75 | 3,470,848.75 |
| 01-Feb-19 | 23,915,000.00 | 0.00 | 659,952.50 | 659,952.50 |
| 01-Aug-19 | 21,025,000.00 | 2,890,000.00 ** | 859,952.50 | 3,549,952.50 |
| 01-Feb-20 | 21,025,000.00 | 0.00 | 579,755.00 | 579,755.00 |
| 01-Aug-20 | 17,975,000.00 | 3,050,000.00 ** | 579,755.00 | 3,629,755.00 |
| 01-Feb-21 | 17,975,000.00 | 0.00 | 495,117.50 | 495,117.50 |
| 01-Aug-21 | 14,755,000.00 | 3,220,000.00 | 495,117.50 | 3,715,117.50 |
| 01-Feb-22 | 14,755,000.00 | 0.00 | 405,762.50 | 405,762.50 |
| 01-Aug-22 | 11,355,000.00 | 3,400,000.00 *** | 405,762.50 | 3,805,762.50 |
| 01-Feb-23 | 11,355,000.00 | 0.00 | 312,262.50 | 312,262.50 |
| 01-Aug-23 | 7,770,000.00 | 3,585,000.00 *** | 312,262.50 | 3,897,262.50 |
| 01-Feb-24 | 7,770,000.00 | 0.00 | 213,675.00 | 213,675.00 |
| 01-Aug-24 | 3,990,000.00 | 3,780,000.00 *** | 213,675.00 | 3,993,675.00 |
| 01-Feb-25 | 3,990,000.00 | 0.00 | 109,725.00 | 109,725.00 |
| 01-Aug-25 | 0.00 | 3,990,000.00 | 109,725.00 | 4,099,725.00 |
| | | $57,000,000.00 | $47,872,007.50 | $104,872,007.50 |

*These are Term Warrants due 8-1-2017 to be Mandatorily Redeemed on this date.
**These are Term Warrants due 8-1-2021 to be Mandatorily Redeemed on this date.
***These are Term Warrants due 8-1-2025 to be Mandatorily Redeemed on this date.

**STATE OF ALABAMA**      )
**JEFFERSON COUNTY**      )

<u>**ACQUISITION AGREEMENT BY AND BETWEEN**
**THE WATER WORKS AND SEWER BOARD**
**OF THE CITY OF BIRMINGHAM**
**and**
**THE CITY OF BIRMINGHAM**</u>

THIS AGREEMENT, made and entered into on this the 23ʳᵈ day of February ~~2000~~ 2001, by and between **THE WATER WORKS AND SEWER BOARD OF THE CITY OF BIRMINGHAM**, a public corporation, organized under the laws of the State of Alabama (hereinafter referred to as the "**BOARD**") and the **CITY OF BIRMINGHAM**, a municipal corporation, organized under the laws of the State of Alabama (hereinafter referred to as the "**CITY**") (both the **BOARD** and **CITY** are hereinafter sometimes collectively referred to as the "**PARTY**" or "**PARTIES**").

**W I T N E S S E T H**

**WHEREAS**, the **BOARD** previously owned and operated certain real and personal properties, including (i) certain water reservoirs and filtration plants, a water transmission and distribution system and various related properties (hereinafter more particularly described and together called the "Water System") and (ii) certain sewage treatment plants and wastewater collection systems (hereinafter more particularly described and together called the "Sewer System") (the "Water System" and "Sewer System" more particularly described below and sometimes collectively called the "System"), the System being located within Jefferson County and certain adjacent counties; and

WHEREAS, the CITY (i) initiated a program to identify and pursue possible methods for utilizing existing and anticipated resources of the CITY to create and provide substantial financial support for the improvement of public education within the CITY, (ii) determined that the resources of the CITY available for the support of public education could be significantly enhanced through a sale and transfer of the System (or various components thereof) to one or more entities, and (iii) determined that the planning and implementation required for such a sale and transfer of the System could be undertaken and completed more efficiently and effectively if the System were transferred and conveyed to the CITY; and

WHEREAS, on September 2, 1998, the System was transferred and conveyed to the CITY and the CITY assumed the indebtedness due on the outstanding revenue bonds of the BOARD; and

WHEREAS, the CITY determined that, it would be in the best interests of the CITY and its residents for the CITY to sell, transfer, convey and assign, to one or more purchasers, those items of real and personal property, contract rights, accounts receivable, franchises, instruments and other general intangibles which are required for the effective operation of the System; and

WHEREAS, the CITY authorized the sale, transfer, conveyance and assignment of such assets, in accordance with the provisions of Ordinance No.98-148 to one or more purchasers; and

WHEREAS, in connection with the **CITY's** acquisition of the System, the **CITY** and the **BOARD** entered into an Assignment, Assumption, Release and Indemnity Agreement dated September 2, 1998 (hereinafter more particularly described and called the "Assignment Agreement"); pursuant to which, among other things, the **CITY** assumed various obligations of the **BOARD**, including all outstanding bonds of the **BOARD** payable from, and secured by a pledge of the revenues derived from the System; and

WHEREAS, the outstanding bonds of the **BOARD** were issued under and secured by an Indenture of Trust, dated December 1, 1985, between the **BOARD** and AmSouth Bank N.A., as original trustee (the successor trustee being The Chase Manhattan Bank), as supplemented and amended (hereinafter called the "1985 Indenture"). In order to operate the System and use the revenues therefrom without having to comply with the conditions and limitations imposed by the 1985 Indenture, it was necessary for the **CITY** to defease the 1985 Indenture and to provide for the retirement of the **BOARD's** outstanding bonds through a pledge of the revenues of the System other than the pledge made in the 1985 Indenture; and

WHEREAS, the **CITY** has issued its Water and Sewer Revenue Warrants, Series 1998-A, and its Taxable Water and Sewer Revenue Refunding Warrants, Series 1998-B, under a Trust Indenture between the City of Birmingham and The Chase Manhattan Bank, dated December 1, 1998, (hereinafter called the "1998 Indenture"), for, among other purposes, obtaining the funds necessary to defease the 1985 Indenture; and

WHEREAS, Pursuant to Ordinance No. 98-195, the City (1) issued its $31,000,000

principal amount General Obligation Capital Improvement Warrants, Series 1998-B (the "1998-B General Obligation Warrants"), (2) pledged the Surplus Systems Revenues (as defined in Ordinance No. 98-195) to secure the payment of the 1998-B General Obligation Warrants and (3) reserved the right to issue other warrants secured, on a parity with the 1998-B General Obligation Warrants, by such pledge of the Surplus System Revenues (the 1998-B General Obligation Warrants and all warrants so issued on a parity therewith herein together called the "Junior Lien Warrants"); and

WHEREAS, the **CITY** has determined that, in its judgment, it would be in the best interests of the **CITY** and its residents for the **CITY** to transfer, convey and assign, to the **BOARD** the System; and

WHEREAS, the **BOARD** desires to acquire from the **CITY** the System; and,

WHEREAS, pursuant to § 2.3, Powers of City, Article II, Mayor-Council Act of 1955, as amended, the **CITY** has all the powers granted to municipal corporations and to cities by the constitution and laws of the State of Alabama together with all the implied powers necessary to carry into execution said powers; and

WHEREAS, pursuant to Alabama Code § 11-50-235(a) (4) (1975), the **BOARD** has the authority to acquire, construct, operate, maintain, enlarge, extend and improve a water system and sewer system such as the System and to receive, acquire, take and hold real, personal and mixed property of any nature whatsoever deemed a necessary or convenient part of such water system or sewer system; and

**WHEREAS,** pursuant to Alabama Code §§11-50-13 and 11-50-238 (1975), the **CITY** has the authority to transfer the System to the **BOARD** without the necessity of authorization at an election of the qualified voters of the **CITY**; and

**WHEREAS,** pursuant to Alabama Code §§ 11-50-13 and 11-50-238 (1975), the **CITY** is authorized to enter into this Agreement in order to cause the transfer of the System to the **BOARD** and to impose any conditions or stipulations the **CITY** deems advisable with respect to the subsequent control, management, operation, extension and improvement of the System; and

**WHEREAS,** pursuant to Alabama Code § 11-50-13(b) (1975), any such transfer by the **CITY** to the **BOARD** may be made with or without pecuniary consideration; and

**WHEREAS,** pursuant to Section 12.6, Continued Operation of the System; Transfer of the System, Article XII, 1998 Indenture, the **CITY** may transfer the entire System to a public corporation whose property and income are not subject to taxation and which has power to own and operate the System provided: (1) the public corporation assumes the obligations of the **CITY** issued pursuant to the 1998 Indenture; and (2) the transfer does not cause or result in any mortgage or other lien that will be prior to or on a parity with the lien of the pledge made in the 1998 Indenture for the benefit of such obligations; and

**WHEREAS,** the **CITY** agrees to transfer to the **BOARD**, and the **BOARD** agrees to acquire from the **CITY**, the System (as hereinafter more particularly defined) on the terms hereinafter set forth.

NOW, THEREFORE, in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration paid by the **BOARD** to the **CITY**, the receipt and sufficiency of which the **CITY** hereby acknowledges, and in consideration of the mutual covenants and agreements hereinafter set forth, the **BOARD** and the **CITY** hereby agree as follows:

1.    **TRANSFER OF ASSETS.**

Subject to the terms and conditions of this Agreement, the **CITY** agrees to grant, bargain, sell, convey, assign and transfer to the **BOARD**, and the **BOARD** agrees to accept the following described properties: (A) (i) all of its right, title and interest to and in the Water System owned by the **CITY** and all real, mixed, tangible and intangible properties and assets that form a part of or pertain to the System, including, without limitation, all lands, buildings, improvements, appurtenances, leases, rights-of-way, crossing agreements, easements, permits, licenses and other interests in, or rights with respect to, land that constitutes part of or appertains to or is used in connection with the operation of and form a part of the Water System and all furniture, fixtures, equipment and other personal property used in connection with the operation of and forming a part of the Water System, including, without limitation, the real property interests and land described in *Exhibit A* attached hereto and constituting a part hereof and the improvements, buildings, equipment, fixtures, furnishings and other property, described in *Exhibit B* and *Exhibit C* attached hereto and constituting a part hereof; and (ii) all right, title and interest of the **CITY** in or to the Sewer System owned by the **CITY** and all of the **CITY's** other real, personal, mixed, tangible and intangible properties and assets that form a part of any such Sewer System,

including, without limitation, all lands, buildings, improvements, appurtenances, leases, right-of-way, crossing agreements, easements, permits, licenses and other interests in, or rights with respect to, land that constitutes part of or appertains to or is used in connection with the operation of and form a part of any sanitary sewer systems owned by the **CITY**, including, without limitation, the real property interests described in *Exhibit A* attached hereto and constituting a part hereof and the improvements, buildings, equipment, fixtures, furnishings and other property, described in *Exhibit B* and *Exhibit C* attached hereto and constituting a part hereof; (B) all right, title and interest of the **CITY** in or to the property described in *Exhibit A* attached hereto and constituting a part hereof and *Exhibit C* attached hereto and constituting a part hereof and all other real property located in the State of Alabama or real property interests in which the **CITY** has an interest relating to the System, and which was owned by the Board on or before September 21, 1998, and property acquired by the City for the operation of the System since September 2, 1998, whether adequately or specifically described herein or not, and all fixtures, buildings and improvements thereon or used in connection therewith, and all personal property of the **CITY** relating to the System, tangible or intangible; and (C) (i) all contract rights, accounts receivable related to the System, choses in action, franchises, general intangibles, documents, instruments, insurance policies and other general intangibles that have been acquired and are now held by the **CITY**, as a result of its ownership or operation of the System and all revenues, issues, earnings, income and profits from the System; (ii) all accounts related to the System, including all of the following accounts with Regions Bank: Operating Account, bearing account

number 03-0102-1206; Sweep Account for Operating Account, bearing account number 03-9002-9339; Agency Account, bearing account number 03-0115-8716; Special Customer Holding Account, bearing account number 03-0115-9372; and Payroll Account, bearing account number 03-0075-0107, together with the following accounts with Chase Corporate Trust:  Construction Fund, bearing account number C28519-C; Revenue Fund, bearing account number C28519-B; Debt Service – Series 1998-A, bearing account number C28519; Debt Service – Series 1998-B, bearing account number C28520; Debt Reserve – Series 1998-A, bearing account number C28519-E; Debt Reserve – Series 1998-B, bearing account number C28520-A; Debt Reserve – Reserve Fund Investment, bearing account number C28520-B; and Development, Replacement and Improvement Fund, bearing account number C28519-G; (iii) all right, title and interest of the **CITY** in, to and under any and all licenses, easements, rights-of-way, crossing agreements, franchises, privileges, immunities, course of dealing, and permits under or pursuant to which it is authorized to engage, whether directly or indirectly, in the construction, acquisition and operation of the System, including, without limitation, the operation of the System in any incorporated municipality and in any nearby unincorporated territory; (iv) all right, title and interest of the **CITY** in, to and under any and all contracts between the **CITY** or the **BOARD** as its agent, and any other person, firm or corporation relating to, or in connection with, the operation of the System or any part thereof, including, without limitation, any contracts, agreements, arrangements or contract rights with respect to service of water or sewer customers presently served by the System; (v) all cash on hand and on deposit (including cash on deposit in

bank accounts), notes receivable arising from operation of the System, customers' security deposits relating to the System, supplies and other properties held for sale in the ordinary course of business or for use or consumption in the operation of the System, and all revenues, earnings, income and profit derived by the **CITY** from the operation of the System or relating thereto; and (vi) all books and records related to the Systems. It is the intent of the parties that this transaction shall be a reconveyance of the System assets which were transferred by the Board to the City on September 2, 1998 and not a conveyance of other assets of the City unless such assets were previously owned by the Board or were acquired by the City for the operation of the System since September 2, 1998, or are listed on *Exhibits A, B, and C* attached hereto.

2.      **CONSIDERATION FOR TRANSFER OF ASSETS.**

At the closing of this transaction, as consideration for the **CITY** transferring, conveying and granting to the **BOARD** the System, the **BOARD** agrees to: (A) Assume the obligations as set out under the City's Water and Sewer Revenue Warrants, Series 1998-A, and its Taxable Water and Sewer Revenue Refunding Warrants, Series 1998-B, which were issued pursuant to the 1998 Indenture, all of which are or will be secured by a pledge of, and are payable solely from, the revenues of the System (hereinafter called the "Assumed Warrants");  (B) Enter into a funding agreement with the City whereby the Board shall agree to pay to the City amounts equal to annual principal and interest requirements, as and when payable, on (i) the City's General Obligation Capital Improvement Warrants, Series 1998-A which are outstanding in the aggregate principal amount of $10,000,000 and Series 1998-B which are outstanding in the aggregate principal amount

of $30,475,000 and (ii) the City's General Obligation Warrants, Series 2000-A, to be issued in an aggregate principal amount not exceeding $57,000,000 (provided that the Board's payment requirements with respect to such General Obligation Warrants, including the Series 1998-A, Series 1998-B, and Series 2000-A Warrants shall not exceed $8,500,000.00 per year for a period that shall not exceed twenty-five (25) years). The Board will grant to the City a lien on net water and sewer revenues as security for the Board's obligations under such funding agreement, which lien shall be junior and subordinate to the lien on such revenues in favor of the holders of the Assumed Warrants and any additional obligations that may be issued in the future by the Board as Parity Securities under the 1998 Indenture; provided, however, that the Board shall covenant in the funding agreement that it shall continuously set rates that generate net water and sewer revenues which cover all of the Board's debt service (including its obligations to the City under the funding agreement) by at least 1.00 times; (C) With the exception of Section 5 of the Assignment Agreement, by which the **CITY** shall continue to be bound, assume all other obligations and liabilities of the **CITY**, relative to the ownership and operation of the System, whether heretofore accrued or hereafter accruing; and  (D) Pay to the **CITY** the sum of  One Hundred Ninety-Six Million Dollars ($196,000,000.00), at the Board's option either in the form of cash or a purchase money bond (hereinafter "Bond"), secured by a purchase money mortgage made payable to the **CITY** together with interest at the rate of 6% per annum, payable at City Hall, Birmingham, Alabama, or at such other place or places as the **CITY** or holder hereof may from time to time designate on September 1, 2001 ( subject to the succeeding provision hereof). If, as provided for in

Section 10 of this Agreement, factors outside the **BOARD's** control (including, without limitation, unresolved legal issues) prevent the issuance by the **BOARD** of tax-exempt bonds to be secured by the revenues of the System by September 1, 2001 on terms generally consistent with the **BOARD's** current expectations, then the term of such Bond shall be extended for successive periods of three months until such tax-exempt bonds have been issued; provided that the maturity date of such Bond shall in no event be later than December 1, 2010. Interest accrued on such Bond shall be payable on the date of payment of the principal thereof determined in accordance with the preceding sentence, and on each June 1, September 1, December 1, and March 1 occurring prior to the final payment of such Bond. For each three-month interest period after the initial interest period (for which interest will be due and payable on June 1, 2001), the principal of such Bond shall bear interest at a rate equal to the Bond Buyer Revenue Bond Index as last published immediately prior to the beginning of such three-month period. The Board may prepay such Bond at any time for an amount equal to the outstanding principal and the then accrued interest.

    3.    **CLOSING.**

The closing of the transactions provided for herein (hereinafter referred to as the "Closing") shall take place at the offices of the **BOARD** located at 3600 First Avenue North, Birmingham, Alabama 35203-0110, or at such other location as the **BOARD** may choose, within five (5) days after the date of this Agreement on a date mutually agreed upon by **CITY** and the **BOARD**. At the Closing, the following documents and instruments, in substantially the form as are attached hereto

as *Exhibits D, E, F, G, H,* and *I,* respectively, shall be delivered and executed: an Assignment and Assumption Agreement; Bill of Sale; Quitclaim Deed, Bill of Sale and Assignment; Assignment of Easements and Right-of-Way Agreement; Assignment; Assumption of Leases; and Funding Agreement.

4.    **FURTHER ASSURANCES**.

The **CITY** shall from time to time, whether before, at, or after Closing, at the **BOARD's** request and without further consideration, execute and deliver such other instruments of transfer, conveyance and assignment and take such other action as the **BOARD** may require to more effectively transfer, convey and assign to and vest in the **BOARD**, and to put the **BOARD** in possession of, any property to be transferred, conveyed, assigned and delivered hereunder.  If there are any contracts, rights, licenses or permits, which cannot be transferred effectively without the consent of the other **PARTY** or **PARTIES** hereto, and such consent is unattainable, the **CITY** will use its best efforts to assign and convey to the **BOARD** the benefits thereof.

5.    **OBTAINING AUTHORIZATION**.

The **PARTIES** will, by proper action, duly adopt all necessary and appropriate resolutions and/or ordinances authorizing the transactions hereunder and take all steps necessary for their execution.

6.    **COVENANT NOT TO RE-TRANSFER SYSTEM ASSETS.**

The **PARTIES** hereby covenant that as long as there is outstanding debt secured either by the System or the revenues generated by the System, the System assets shall not be re-transferred to the **CITY.**

7.    **ENVIRONMENTAL ASSURANCES FOR SYSTEM ASSETS.**

In order to ensure that the assets of the System are properly utilized to operate the System and to ensure that the assets of the System are permanently protected from any and all land development activities which could be harmful to the System, the **BOARD** hereby agrees as follows:  (A) To enter into an agreement similar to that attached hereto as *Exhibit J*, with a land preservation trust such as the Alabama Forever Wild Land Trust or the Nature Conservancy of Alabama, whereby the System real estate generally described as all real estate contiguous to Lake Purdy and located in the Sections 35 and 36-Township 17 South- Range 1 West; Section 6-Township 18 South- Range 1 East; and Sections 1, 2, 3, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 28 and 29-Township 18 South- Range 1 West; and the System real estate generally described as all real estate located along the Cahaba River and north of U.S. Highway 280 and located in Sections 23, 24, 25 and 26; Township 18 South; Range 2 West.  Less and except the property in the Northwest 1/4 of the Southeast 1/4 of Section 23; Township 18 South; Range 2 West where the existing Cahaba Pumping Station is located and the Southwest 1/4 of Section 26; Township 18 South; Range 2 West where the existing Cahaba River Diversion Dam is located, shall be permanently protected from any and all land development activities which could be

harmful to the System; and  (B) To impose a 6 month moratorium on the sale or lease of all real estate of the System, (other than such real estate referred to in sub-paragraph (A) which has either been sold in fee to a land preservation trust or otherwise restricted by an easement or covenanted to ensure that said real estate is permanently protected from any and all land development activities which could be harmful to the System), while the Mayor of the **CITY** initiates a land use study to determine the long-range use of the watershed lands and other properties acquired by the **CITY** in the transfer of the System to the **CITY**. Said land use study to be performed as follows: (1) the initial step toward such a plan will require a study involving the Office of the Mayor and appropriate **CITY** departments, the Birmingham City Council, the **BOARD,** Jefferson County, and key stakeholders, including but not limited to the Cahaba River Society, the Cahaba River Coalition, and Concerned Citizens for Social Change; and (2) Phase I of the study will assess and categorize all System assets to determine their actual and potential impacts on the System's operations, and their importance for the protection of the watershed and water quality, and will upon completion be subject to a public hearing; and (3) Phase II of the study will evaluate the properties categorized in Phase I, to formulate recommendations for enacting development controls designed to ensure long-term protection of environmentally sensitive properties, and will upon completion be presented to the **BOARD** for a public hearing and consideration of adoption.  The timely completion of this study may require the services of an outside consultant, in which event the procurement of such services by the Mayor would take place in accordance with Section 3-1-7 of the Mayor-Council Act of 1955, as amended.

8.    **OFFER TO FORM UNION.**

The **BOARD** hereby agrees that if, within 30 days of the Closing, a labor union or organization recognized by the Alabama Department of Labor submits to the Department of Labor the requisite percentage of applications for union membership and check-off authorizations of eligible, full time, non-supervisory employees of the **BOARD**, to the extent it may by law do so, the **BOARD** will allow an election to take place to determine whether said employees wish to join said labor union or organization.  Should a majority of said employees vote to join a labor union or organization, then, to the extent it may by law do so, the **BOARD** will acknowledge said labor union or organization.

9.    **COVENANT AGAINST PRIVATE MANAGEMENT.**

It is the intent of the **BOARD** to operate and manage the System, and the **BOARD** hereby covenants and agrees that it will not enter into any contract or agreement with any private entity, corporation or organization under which such private entity, corporation or organization would operate and manage the System, nor will the **BOARD** enter into any  agreement under which the System would be sold, conveyed or otherwise transferred to a private entity, corporation or organization.

10.    **AGREEMENT CONCERNING BOARD FINANCING.**

The **PARTIES** acknowledge that the **BOARD** intends to finance the cash component of the purchase price of the System through the issuance of tax-exempt bonds to be secured by a pledge of the System revenues.  The **BOARD** hereby covenants to use its reasonable best efforts

to authorize and issue such bonds within 90 days of the date of delivery of this Agreement.  In the event that factors outside the **BOARD's** control (including without limitation, unresolved legal issues) prevent the issuance of such bonds within such period on terms generally consistent with the **BOARD's** current expectations, the **BOARD** will use its reasonable best efforts to issue such bonds as soon as practicable after the resolution or elimination of the proceedings or circumstances that prevented such issuance within the specified 90-day period.  The **PARTIES** agree that the Bond delivered by the **BOARD** to the **CITY** as part of the consideration for the System will provide for an extension of the maturity date of such Bond in the event that factors outside the **BOARD's** control delay the tax-exempt bond financing.  The **CITY** hereby agrees to cooperate with the **BOARD** in its efforts to issue such tax-exempt bonds and in its efforts to comply with the legal requirements applicable to tax-exempt financing, including, without limitation, the arbitrage rebate requirement.  The **CITY** further agrees to pay, or reimburse the **BOARD** for, any rebate obligation owed to the Internal Revenue Service to the extent that such obligation is referable to investment income received by the **CITY**.

    11.    **SURVIVAL OF REPRESENTATIONS AND WARRANTIES**.

The **CITY** and the **BOARD** agree that all representations, warranties, covenants, and agreements made in or pursuant to this Agreement shall survive the Closing.

    12.    **NOTICES**.

All notices given pursuant to the terms of this Agreement shall be in writing and delivered in person or transmitted by certified mail, return receipt requested, postage prepaid.

Notices required to be given to the **BOARD** shall be addressed as follows:

> The Water Works & Sewer Board
> of the City of Birmingham
> C/O General Manager
> P. O. Box 830110
> Birmingham, AL  35283-0110

Notices required to be given to the **CITY** shall be addressed as follows:

> The City of Birmingham
> C/O Council President
> City Hall - Third Floor
> 710 20th Street North
> Birmingham, AL 35203

13.  **APPLICATION OF LAW.**

This Agreement shall be governed in accordance with the laws of the State of Alabama.

14.  **SUCCESSORS AND ASSIGNS.**

The provisions of this Agreement shall be binding upon and inure to the benefit of the

**PARTIES** hereto and their respective successors and permitted assigns; provided, however, that

no **PARTY** may assign, delegate or otherwise transfer any of its rights or obligations under this

Agreement without the consent of the other **PARTY** hereto.

15.  **CONSTRUCTION.**

The **BOARD** and the **CITY** have participated jointly in the negotiation and drafting of

this Agreement.  In the event any ambiguity or question of intent or interpretation arises, this

Agreement shall be construed as if drafted jointly by the **BOARD** and the **CITY**, and no

presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the

authorship of any of the provisions of this Agreement.

16.    **SEVERABILITY.**

The **PARTIES** agree that the provisions of this Agreement shall be severable.  In the event that any provision hereof is held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, such invalid, void or otherwise unenforceable provision shall be automatically replaced by another provision as similar as possible in terms to such invalid, void or otherwise unenforceable provision but which is valid and enforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law.

17.    **HEADINGS.**

The headings preceding the text of the sections and subsections hereof are inserted solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

18.    **EXECUTION IN COUNTERPARTS.**  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the **CITY OF BIRMINGHAM** has caused this Agreement to be executed by its duly authorized representative, and **THE WATER WORKS AND SEWER BOARD OF THE CITY OF BIRMINGHAM** has caused this Agreement to be executed by its duly authorized representative, all as of the date first above written.

ATTEST:

THE CITY OF BIRMINGHAM

By: _____

_____
Its: City Clerk

William A. Bell
Its: Council President

ATTEST:

THE WATER WORKS AND SEWER BOARD OF THE CITY OF BIRMINGHAM

_____
Its: Secretary-Treasurer or
Assistant Secretary-Treasurer

By _____

Anthony L. Barnes
Its: Chairman-President

**STATE OF ALABAMA** )
**JEFFERSON COUNTY** )

    I, a Notary Public in and for said County in said State, hereby certify that William A. Bell, whose name as Council President of the City Council of the CITY OF BIRMINGHAM, a municipal corporation, is signed to the foregoing Agreement, and who is known to me, acknowledged before me on this day that, being informed of the contents of said Agreement, he, as Council President of the City Council of the CITY OF BIRMINGHAM and with full authority, executed the same voluntarily for and as the act of said municipal corporation.

    Given under my hand and official seal this _23_ day of _February_, ~~2000~~ 2001.

_Kimberly S Vaughn_
Notary Public

AFFIX SEAL
My Commission Expires: _NOTARY PUBLIC STATE OF ALABAMA AT LARGE_
_MY COMMISSION EXPIRES: July 6, 2003_
_BONDED THRU NOTARY PUBLIC UNDERWRITERS_

**STATE OF ALABAMA** )
**JEFFERSON COUNTY** )

    I, a Notary Public in and for said County in said State, hereby certify that Anthony L. Barnes, whose name as Chairman-President of THE WATER WORKS AND SEWER BOARD OF THE CITY OF BIRMINGHAM, a public corporation, is signed to the foregoing Agreement, and who is known to me, acknowledged before me on this day that, being informed of the contents of said Agreement, he, as Chairman-President of THE WATER WORKS AND SEWER BOARD OF THE CITY OF BIRMINGHAM and with full authority, executed the same voluntarily for and as the act of said corporation.

    Given under my hand and official seal this _11th_ day of _August_, 2000.

_Grace E. Amison_
Notary Public

NOTARY PUBLIC STATE OF ALABAMA AT LARGE.
MY COMMISSION EXPIRES: May 31, 2002.
BONDED THRU NOTARY PUBLIC UNDERWRITERS.

AFFIX SEAL

My Commission Expires: _5-31-02_

**THIS INSTRUMENT PREPARED BY:**

**GORHAM & WALDREP, P.C.**
**2101 Sixth Avenue North**
**Suite 700**
**Birmingham, Alabama 35203**
**PH: (205) 254-3216**